IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| LISA TROUT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| KNOX COUNTY BOARD OF | ) | |
| EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## **COMPLAINT**

The Plaintiff Lisa Trout sues the Defendant Knox County Board of Education and

for cause of action states:

**A.      The Parties.**

1.      The Plaintiff is a citizen and resident of Blount County, Tennessee.  The

Plaintiff is a licensed teacher in the Knox County school system.  The Plaintiff has taught

in the Knox County school system since 1992.  Since 2004 the Plaintiff has been assigned

as a teacher at the Richard Yoakley Alternative School.

2.      The Defendant is a body politic and is responsible under Tenn. Code Ann.

§ 49-2-203 for the management and control of the schools that comprise the Knox

County school system.  The Defendant is a "person" subject to suit under 42 U.S.C. §

1983.  The Defendant employs a Superintendent who acts as the chief administrative

official of the Knox County school system and who is responsible for seeing that the laws

affecting the schools and the rules of the State Board of Education and of the Defendant

are faithfully executed. At all relevant times, Dr. James McIntyre has served as the Superintendent of Knox County schools.

**B.    Jurisdiction and Venue.**

3.    This is an action to remedy a deprivation by the Defendant of the Plaintiff's statutory rights under Tennessee law and her constitutional rights under the Tennessee and United States Constitutions. The challenged actions of the Defendant were taken under color of state law. The Defendant is subject to liability on the Plaintiff's federal constitutional claims pursuant to 42 U.S.C. § 1983. This Court has jurisdiction over the Plaintiff's claims federal constitutional claims under 28 U.S.C. §§ 1331 and 1343. The Court has supplemental jurisdiction over the Plaintiff's state law claims under 28 U.S.C. § 1367.

4.    All of the challenged actions occurred in Knox County, Tennessee. Venue is proper in this Court.

**C.    "Race to the Top" and "First to the Top."**

5.    In 2009 the federal government announced a "Race to the Top" competition for $4.35 Billion in federal grants to support education reform and innovation. In its First Extraordinary Session of 2010, the Tennessee General Assembly passed and then-Governor Bredesen signed into law on January 16, 2010, the "First to the Top Act of 2010" in support of Tennessee's competition for the "Race to the Top" grant.

6.    Among other components, the First to the Top Act amended Tenn. Code Ann. § 49-1-302(d) to call for the creation of the "Teacher Evaluation Advisory Committee," a fifteen-member committee that was to develop and recommend to the State Board of Education guidelines and criteria for the annual evaluation of all teachers

and principals employed by local education agencies. The guidelines and criteria were to include a local level grievance evaluation procedure by which evaluated teachers and principals could challenge only the accuracy of the data used in the evaluation and the adherence to the evaluation policies adopted by the State Board of Education.

7. On March 2, 2010, Governor Bredesen appointed nine individuals to serve on the Teacher Evaluation Advisory Committee (TEAC) established in the First to the Top Act. Those appointments included Mike Edwards, President and CEO of the Knoxville Chamber of Commerce. Mr. Edwards was subsequently appointed to the State Board of Education, on which he has served since June 24, 2011.

8. The First to the Top Act mandated in Tenn. Code Ann. § 49-1-302(d)(2) that the evaluations be a factor in employment decisions, including but not limited to promotion, retention, termination, compensation, and the attainment of tenure status.

9. As an exception to the foregoing requirement, the First to the Top Act declared in Tenn. Code Ann. § 49-1-302(d)(6) that if an individual was assigned to teach in an area for which she was not endorsed, any evaluation conducted for the course outside the area of endorsement would relate only to the improvement of teaching skills and strategies and not a determination of competency.

10. The First to the Top Act required in Tenn. Code Ann. § 49-1-302(d)(2) that fifty percent (50%) of the evaluation criteria be comprised of student achievement data, broken down into thirty-five percent (35%) based on student growth data as represented by the Tennessee Value-Added Assessment System (TVAAS) and fifteen percent (15%) based on other measures of student achievement selected from a list

developed by the Teacher Evaluation Advisory Committee and adopted by the State Board of Education.

11.     TVAAS, the source of the "student growth data" that comprises thirty-five percent (35%) of the evaluation criteria under the First to the Top legislation, is described in Tenn. Code Ann. § 49-1-603 as a statistical system for educational outcome assessment that uses measures of student learning to enable the estimation of teacher, school and school district statistical distributions.  TVAAS is used to estimate the impact a teacher, school and school district have on the educational progress of students.  That impact is referred to as the "effect" of the teacher, school or school district on the educational progress of students.

12.     In 1992, as part of the Education Improvement Act of 1992, the Tennessee Legislature in Tenn. Code Ann. § 49-1-606 called for the use of data from TCAP tests, or their future replacements, for the purpose of estimating the statistical distribution of teacher effects on the educational progress of students within school districts for grades three through eight.  It is that data on which TVAAS estimates are based.

13.     From the enactment of the Education Improvement Act in 1992 until the enactment of the First to the Top Act in 2010, a specific teacher's effect on the educational progress of students, as evidenced by TVAAS, could not be used as a part of formal personnel evaluation until data from three (3) complete academic years were obtained.  In the First to the Top Act, that limitation was removed.

14.     The new teacher evaluation system called for in the First to the Top Act was a component of Tennessee's Race to the Top grant proposal to the United States Department of Education.  Following the passage of the First to the Top Act, then-

Governor Bredesen gathered a five-member team of government officials who traveled to Washington, D.C., in March 2010 to present the grant proposal. Superintendent McIntyre played an integral part in the development of the grant proposal and was one of the members of the team of government officials who traveled with Governor Bredesen to present the grant proposal.

15. On March 29, 2010, United States Secretary of Education Arne Duncan announced that Tennessee was one of two states to win grants in the first round of the Race to the Top competition, winning a grant of approximately $500 Million in federal dollars to implement comprehensive school reform plans.

16. On June 21, 2010, Governor Bredesen announced appointments to the First to the Top Advisory Council, whose function was to provide strategic guidance, direction, and thought leadership to State policymakers overseeing implementation of the First to the Top Act. Superintendent McIntyre was one of Governor Bredesen's appointees to the Advisory Council.

**D.    Tennessee Teacher Evaluation under the First to the Top Act.**

17. On or about November 4, 2011, the Tennessee State Board of Education adopted on final reading Policy 5.201, the Teacher and Principal Evaluation Policy called for by the First to the Top Act. A copy of Policy 5.201 is attached as **Exhibit 1**.

18. Policy 5.201 declares that evaluations will be used to inform "human capital decisions," including but not limited to decisions on hiring, assignment, promotion, tenure, dismissal, and compensation.

19. Policy 5.201 requires local boards of education to develop or adopt evaluation models for teachers that must meet the Policy's guidelines and criteria.

20.     According to Policy 5.201, fifty percent (50%) of the evaluation criteria is to be comprised of "student achievement data," including thirty-five percent (35%) based on "student growth data" and fifteen percent (15%) based on "other measures of student achievement.  Under this Policy requirement, more than one-third of a teacher's summative rating is comprised of the "student growth data."

21.     Policy 5.201 requires that for a teacher with individual value-added results, the student growth measure will be comprised of the teacher's TVAAS results.

22.     TVAAS results are available for teachers who teach grades 3 through 8 and for high school teachers in subjects that include Algebra, English, Biology, and U.S. History.

23.     A majority of Tennessee's public school teachers teach grades or subjects for which there is no student test data and consequently for which there is no individual TVAAS data.  For these educators, Policy 5.201 calls for Local Education Agencies to choose from a list of options that allegedly have been shown capable of measuring student growth.  That list of options is to be approved by the Tennessee Department of Education prior to the start of each school year.  Policy 5.201 declares that in lieu of the availability of growth measures for all educators without individual TVAAS results, school-level value-added results will be the standard student growth measure while other growth measures are in development.

24.     In accordance with the requirements of the First to the Top Act, Policy 5.201 permits a teacher to pursue a local grievance of her evaluation results.  The scope of such a grievance is limited to challenging (a) the accuracy of the data used in the evaluation, or (b) adherence to the Policy.

25.     In December 2011, the Governor of Tennessee asked the State Collaborative on Reforming Education ("SCORE") to conduct a formal statewide listening and feedback process on the teacher evaluation system and to produce a report to the State Board of Education and the Department of Education that would reflect feedback from across the state and would propose a range of policy considerations for refining the teacher evaluation system moving forward.  SCORE produced that report in June 2012.

26.     The SCORE report noted that approximately two-thirds of teachers did not have individual value-added student growth data for their grades and subjects and therefore had a substantial portion of their evaluations determined on the basis of school-wide data rather than individual data.  For these teachers, according to the SCORE report, "35 percent of their evaluation is not directly tied to their own individual performance." *Score Report*, p. 5.

27.     The SCORE report also noted that "[c]urrently, the 15 percent student achievement measure is not viewed as directly driving effective teaching."  *Score Report*, p. 5.

28.     The SCORE report stated that there were "remaining gaps in the development and implementation of the multiple measures that form the backbone of the evaluation system" and recommended that "gaps in the quantitative measure, and some missing elements in the qualitative measure, be addressed as soon as possible."  *Score Report*, p. 6.

**E.** **Tennessee Value Added Assessment System.**

29. TVAAS is the acronym for the Tennessee Value Added Assessment System, a statistical system described in Tenn. Code Ann. § 49-1-603.

30. TVAAS is a value-added model (VAM). There are a number of different VAMs. The TVAAS VAM was developed approximately twenty years ago by Professor William Sanders, a statistician who at that time worked at the University of Tennessee in Knoxville. Today Dr. Sanders is Senior Manager of Value-Added Assessment and Research for SAS Institute, Inc., where he has been since June 2000. The State of Tennessee contracts with SAS Institute, Inc., for SAS to conduct a "multivariate, longitudinal analysis" of test data for students in order to generate TVAAS results. That analysis is achieved with a complex and proprietary software system possessed and operated by SAS. The State of Tennessee pays SAS approximately $2 Million annually to generate TVAAS results.

31. SAS describes the "linear mixed model for system, school and teacher value-added reporting" as being represented by the following equation in matrix notation:

$$y = X\beta + Zv + \varepsilon$$

where y in the TVAAS context is the m x 1 observation vector containing test scores (usually NCEs) for all students in all academic subjects tested over all grades and years (usually up to five years); X is a known m x p matrix which allows the inclusion of any fixed effects; $\beta$ is an unknown p x 1 vector of fixed effects to be estimated from the data; Z is a known m x q matrix which allows for the inclusion of random effects; v is a non-observable q x 1 vector of random effects whose realized values are to be estimated from

8

the data; and ε is a non-observable m x 1 random vector variable representing unaccountable random variation.

32.     The results produced by TVAAS are not mathematically precise "scores." The results produced by TVAAS are statistical estimates derived from a computer-driven application of the TVAAS formula to student test scores.

33.     Measurement error exists within all test scores, and inevitably populations of tested students include those with missing test scores.

34.     TVAAS is not a "measure" of student "achievement."  TVAAS results for individual teachers are statistical estimates, not "measures."  TVAAS results are estimates of growth in student test scores on a single standardized test administered on a single occasion during a given school year.  TVAAS estimates do not address proficiency or achievement but instead address only year-over-year increases in standardized test scores and attempt to estimate teacher, school, and school district effect on those year-over-year standardized test score increases.

35.     The TVAAS model uses the most recent five years of testing history for all students when calculating a teacher's individual TVAAS estimate each school year. The teacher's individual TVAAS statistical estimate is recalculated annually using the most recent five years of student test scores for all students.  As a result, an individual teacher's TVAAS estimate for a given year may change in subsequent years based on a recalculated statistical analysis of different data.  According to SAS, the most recent analyses of previous years are a better estimate of the teacher's effectiveness than the original ones because more data on the students is available.

36.     Because TVAAS results are statistical estimates, they are accompanied by a "standard error" which represents the level of certainty associated with each estimate. By adding to the estimate and subtracting from the estimate a figure of 1.96 times the standard error, a range or "confidence interval" of 95% is created, meaning that one can be 95% confident that the teacher's true value-added effect falls somewhere within that range or interval.

37.     In a publication called "Using and Interpreting Tennessee's Value-Added Assessment System: *A Primer for Teachers and Principals*," written by two employees of the University of Tennessee Value-Added Research and Assessment Center along with the then-Coordinator of Research and Evaluation for the Knox County Schools, the authors pointed out that the statistics represented by TVAAS results were "estimates" of truth and that real truth existed in theory only. The authors further pointed out, "If standard errors of estimates are not taken into account, it is very easy to overreact to differences among reported gains and percentages."

38.     Individual TVAAS results are reported in a fashion under which a teacher receives a Level 1, 2, 3, 4, or 5 rating based on the statistical estimate. The five "Levels" at which TVAAS estimates are reported correlate with the performance levels at which teachers are rated in the evaluation system developed and implemented in conjunction with the First to the Top Act. Level 1 denotes "significantly below expectations." Level 2 denotes "below expectations." Level 3 denotes "meets expectations." Level 4 denotes "exceeds expectations." Level 5 denotes "significantly exceeds expectations."

39.     A TVAAS result lower than -2 correlates with a Level 1 "significantly below expectations" rating. A TVAAS result between -1 and -2 correlates with a Level 2

"below expectations" rating. A TVAAS result between -1 and +1 correlates with a Level 3 "meets expectations" rating. A TVAAS result between +1 and +2 correlates with a Level 4 "exceeds expectations" rating. A TVAAS result above +2 correlates with a Level 5 "significantly exceeds expectations" rating.

40. When the standard error is used to establish a 95% confidence interval, it is not uncommon for an individual teacher's TVAAS estimate in a given year to fall within a confidence interval that spans three or more rating levels.

41. The data on which a teacher's TVAAS estimates are based is all submitted to SAS and input into a computer so that the proprietary SAS program can generate the TVAAS estimates. Although the First to the Top Act and State Board of Education Policy 5.201 call for a local grievance procedure in which a teacher can grieve her evaluation results based on the accuracy of the data, the data on which a teacher's TVAAS estimates are based is not available to the teacher.

42. Despite the imprecision of TVAAS statistical estimates for individual teachers as evidenced by the relatively large standard error that accompanies those estimates and the relatively broad confidence intervals within which those estimates lie; despite the volatility of TVAAS statistical estimates for individual teachers as evidenced by the recalculation of any given year's estimate in each of the next four years; and despite the absence of any meaningful opportunity on the part of a teacher to challenge the accuracy of her TVAAS statistical estimate due to the unavailability to her of the underlying data on which the estimate is based, the State of Tennessee now uses individual TVAAS statistical estimates as a major component of a teacher's overall evaluation and as a major component for a variety of high-stakes employment decisions,

including but not limited to eligibility for tenure; loss of tenure; establishment of "inefficiency" as a cause for dismissal; and advancement of a teaching license. The State Board of Education, on the recommendation of the Commissioner of Education, has adopted new teacher licensure standards that will take effect in 2015 and that establish individual TVAAS statistical estimates as a major component, and in some instances as the sole basis, for determinations on whether a teacher will be permitted to renew her professional license.

43.     In addition, the State of Tennessee has encouraged local school districts to use individual TVAAS statistical estimates as a major component in local decisions regarding teacher compensation.

    **F.     The APEX Strategic Compensation System.**

44.     Beginning in the fall of 2011, the Defendant implemented the APEX strategic compensation system. The Defendant professes that the APEX system "incents and rewards the inputs and outcomes that support greater student academic achievement and growth."

45.     Under the APEX system, teachers may earn additional compensation awards annually that range from $2,000 for exemplary performance and $1,500 for model performance.

46.     A teacher's eligibility for an APEX award is determined based on a consideration of various components or metrics. The teacher's summative evaluation results comprise 70% of the components or metrics. That 70% is broken down into equal parts, with half of it based on the "qualitative" portion of the teacher's evaluation and the other half based on "student growth." The "student growth" component therefore

accounts for 35% of the total components based on which the teacher's eligibility for an APEX award is determined. "Student growth," in turn, is comprised primarily of TVAAS results. Of the half of the teacher's summative evaluation that is treated as "student growth," 35% is TVAAS results and the other 15% is other measures of student achievement. These proportions are the same proportions that these measures bear to a teacher's overall evaluation under the First to the Top Act and under State Board of Education Policy 5.201.

### G. The Defendant's Denial of an APEX award to the Plaintiff.

47. Under Tenn. Code Ann. Section 49-2-303, the Director or Superintendent of Schools employs principals for the public schools, entering into separate written contracts with them. It is the duty of the school principal to supervise the operation and management of the personnel of the school and to assume administrative responsibility and instructional leadership of the school under the supervision of the Superintendent.

48. At all times material, Thomas Watson (hereafter referred to as "Principal Watson) was the principal employed by Superintendent McIntyre at Richard Yoakley School. At all times material, Principal Watson exercising administrative responsibility and instructional leadership of Richard Yoakley School under the supervision of Superintendent McIntyre.

49. For many years the Plaintiff taught Algebra I, a class she was endorsed to teach, at Richard Yoakley School. In the Spring of 2010, the Plaintiff was assigned to teach an Algebra II class, for which she did not carry an endorsement. Near the end of the first grading period in the Spring of 2010, a mathematics coach at Richard Yoakley School took over the responsibility for teaching the Algebra II class. In the fall of the

2010-2011 school year, the Plaintiff was again assigned to teach Algebra II and continued to teach Algebra II thereafter, as assigned, although she was teaching outside her areas of endorsement.

50.     On September 11, 2011, Principal Watson sent a memo to the Plaintiff and all other teachers at Richard Yoakley School informing them that he had attended a meeting about TEAM.  TEAM is the acronym for the Tennessee Educator Acceleration Model, the version of the evaluation system used in most school districts in Tennessee including the Knox County school system.  Upon his return from the meeting about TEAM, Principal Watson informed the teachers at Richard Yoakley School, an alternative school, that the 35% growth measure to be used in the evaluation of teachers at alternative schools would be based on system-wide TVAAS results.  A copy of Principal Watson's September 23, 2011, memo is attached as **Exhibit 2**.

51.     On October 18, 2011, John Beckett of the Knox County school system's "Accountability" department sent a memo to the Plaintiff and other school personnel. Attached to Mr. Beckett's memo was "some data to assist you in choosing your 15% measure," the other measure of student achievement under the TEAM evaluation system. The attachment was a pre-printed form which disclosed the bases for various teachers' 35% TVAAS growth measures and 15% other achievement measures.  The form identified alternative schools and named three of them, including Richard Yoakley School, and specified that for teachers at those schools the 35% growth measure would be based on system-wide TVAAS results, and the 15% "other achievement" measure would also be based on system-wide data.  A copy of Mr. Beckett's October 18, 2011, memo and attachment are attached as collective **Exhibit 3**.

52.     At the beginning of the 2012-2013 school year, the Plaintiff met with Principal Watson for her "Beginning of the Year Conference," where she was informed that she had received a composite evaluation score of 4 for 2011-2012.  Having received the highest possible APEX scores in "Objective 3: Teacher Leadership" and "Objective 4: High-Needs Schools," and an overall evaluation result of 4 based on her observations and system-wide TVAAS data for the remaining portion of her APEX scores, the Plaintiff was led to believe that she had earned a $1,500 APEX bonus for 2011-2012 which would be paid to her, along with all others who earned such a bonus, in November 2012.

53.     The Plaintiff did not receive her APEX bonus as expected.  Accordingly, she began inquiring about why it had not been paid.  After several months of exchanges of information, the final response from the Defendant came on April 11, 2013, in an email from Nakia Towns, Chief Accountability Officer for the Knox County school system.  A copy of Ms. Towns' email is attached as **Exhibit 4**.

54.     Notwithstanding the information she had been given by Principal Watson and Mr. Beckett as evidenced by Exhibits 2 and 3, the Plaintiff did not receive a TVAAS result for 2011-2012 based on system-wide data but rather based on individual data derived from test results of her students at the alternative school.  The Plaintiff had not entered her own data in the claiming system since she understood she would not have individual TVAAS data.  Instead, a counselor at Richard Yoakley School entered the data without the Plaintiff's knowledge.  Ms. Towns acknowledged that mistakes had been made in the attendance data.  Yet, according to Ms. Towns, the Plaintiff should have

checked that data in August 2012 even though the Plaintiff had not entered the data and had been informed twice in 2011-2012 that there would be no such data.

55.    Ignored in Exhibit 4 was the fact that the students on whose data the Plaintiff's surprise individual TVAAS result was based were Algebra II students.   In 2011-2012 the Plaintiff was certified to teach Algebra I but did not have the certification to teach Algebra II, which by state law meant that her evaluation results related to Algebra II could only be used for a limited basis.

56.    On the basis of the surprise individual TVAAS result derived from test data for Algebra II students that the Plaintiff did not enter into the claiming system, had no reason to know had been entered into the claiming system, and on account of whom the Plaintiff had no basis to expect an individual TVAAS result, the Plaintiff received an individual TVAAS result of 1.   Because she received that individual TVAAS result, rather than the system-wide TVAAS result she had been told she would receive, she did not qualify for an APEX bonus.   By the time the Plaintiff learned that data had been improperly entered and relied upon for an improper purpose, contrary to what she had been informed by the Defendant, the Plaintiff's limited time to challenge those actions had passed.

57.    In addition to depriving the Plaintiff of the APEX bonus she should have received on the basis of system-wide TVAAS data, the Defendant relied on the Plaintiff's TVAAS result of 1 as a basis for subjecting the Plaintiff to additional observations during the 2012-2013 school year.

## COUNT ONE

58.     The APEX bonus program is a supplemental compensation benefit program offered by the Defendant to the Plaintiff and similarly situated employees. The offer of the APEX bonus was made to the Plaintiff as consideration for the Plaintiff's continued work in the Knox County school system and for the Plaintiff's performance of that work at a level sufficient to earn the APEX bonus. A teacher who meets the requirements of the APEX bonus program for receipt of a bonus has a contractual entitlement to the bonus for which she qualifies by virtue of the Defendant's offer.

59.     The contractual requirements for the Plaintiff's receipt of an APEX bonus included the achievement of certain levels of performance under the Tennessee teacher evaluation system in use in the Knox County schools. Under the terms of the APEX bonus program, those performance achievement levels were measured in part by the Plaintiff's TVAAS results. Under the terms of the Defendant's offer to the Plaintiff, the portion of the Plaintiff's performance achievement level measured by TVAAS results was to be based on system-wide results.

60.     By denying an APEX bonus to the Plaintiff on the basis of individual TVAAS results after having offered the bonus under terms that called for the measure of the Plaintiff's performance to use system-wide TVAAS results, the Defendant breached its contract with the Plaintiff for payment of the APEX bonus.

## COUNT TWO

61.     Once the Plaintiff satisfied the terms of the APEX bonus program and qualified for receipt of a bonus under that program on the basis of system-wide TVAAS results, the Plaintiff acquired a property interest in her right to receive the APEX bonus.

62.     By denying the Plaintiff the APEX bonus she earned on the basis of individual TVAAS results, after the Plaintiff had acquired a legitimate expectation of receiving the APEX bonus on the basis of system-wide TVAAS results in accordance with the Defendant's own standards for the APEX bonus program, the Defendant deprived the Plaintiff of her property interest in receipt of the APEX bonus she earned without due process.

63.     The Defendant determined the Plaintiff's ineligibility for the APEX bonus on the basis of individual TVAAS results of students the Plaintiff did not claim.  Because the Plaintiff did not claim the students for herself, and because the Defendant had informed the Plaintiff that her APEX bonus eligibility would depend on system-wide TVAAS result, the Plaintiff had no legitimate expectation of having individual TVAAS results that required her review of the claimed students.  By refusing to consider the propriety of denying the Plaintiff's APEX bonus because the time for review of claimed students that the Plaintiff knew nothing about had passed, the Defendant acted arbitrarily and deprived the Plaintiff of her property interest in the APEX bonus without due process, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and in violation of Article I, Section 8, of the Tennessee Constitution.

## COUNT THREE

64.     The Defendant's APEX bonus system adopts and incorporates the components of the evaluation system adopted pursuant to the First to the Top Act, as set out in State Board of Education Policy 5.201, as components for determining whether a teacher meets the qualifications for and receives an APEX bonus. Tenn. Code Ann. § 49-

1-302(d)(2)(A) requires that the evaluation policy include a local level evaluation grievance procedure under which the evaluated teacher will have a means to challenge the accuracy of the data used in the evaluation. Pursuant to that statutory mandate, State Board of Education Policy 5.201 sets out a local-level grievance procedure under which "accuracy of the data" is defined to mean "only that the data identified with a particular teacher is correct."

65. The TVAAS estimate for an individual teacher is based on data accumulated for a cohort of students over a period of years, not just on test data for students in the year in which they are with a given teacher.

66. The data used for TVAAS estimates, which consists of student results on standardized tests, is not accessible by the Plaintiff or any other individual teacher. The only "data" that a teacher can verify as accurate is the list of students linked to, or "claimed" by, the teacher. The test scores of those students, and the test results from which those scores are generated, are not provided to or available to the teacher. Consequently, notwithstanding the limited local-level grievance procedure mandated in the First to the Top Act, the teacher evaluation system developed pursuant to that Act and utilized by the Defendant as a component of the APEX bonus program provides a teacher no opportunity for any sort of hearing at a meaningful time and in a meaningful manner to challenge any decision made on the basis of TVAAS results because the teacher has no opportunity to test the accuracy or validity of those results.

67. By denying the Plaintiff an APEX bonus on the basis of TVAAS results based on data that is inaccessible to the Plaintiff, the Defendant denied the APEX bonus without giving the Plaintiff any opportunity for a hearing at a meaningful time and in a

meaningful manner on that denial. The resulting deprivation of the Plaintiff's legitimate expectation of an APEX bonus without an opportunity for a meaningful hearing constituted a deprivation of the Plaintiff's property interest in the APEX bonus without due process, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and in violation of Article I, Section 8, of the Tennessee Constitution.

## COUNT FOUR

68.    TVAAS results do not measure achievement. TVAAS results purport to measure student "growth." The growth that TVAAS results measure is limited to growth in student results on standardized test scores.

69.    TVAAS results are not mathematically precise scores. TVAAS results are statistical estimates. Statistical estimates are accompanied by a "standard error," which is itself a statistical estimate of the reliability of the underlying estimate and the possibility that the underlying estimate is affected by error. By adding and subtracting some multiple of the standard error to and from the statistical estimate, one produces a "confidence interval." For a statistical estimate to be reliable for predictive purposes, statisticians generally opt for a 95% confidence interval. This means that while the statistical result is just an estimate of the truth, there is a 95% probability that the real truth lies somewhere within that confidence interval. A 95% confidence interval is determined by adding and subtracting 1.96 times the standard error to and from the estimate.

70.    For an individual teacher TVAAS estimate, as compared to a district-wide TVAAS estimate, the standard error that accompanies the estimate is relatively large. In

a rating system under which a TVAAS result is labeled as a Level 1 (substantially below expectations); Level 2 (below expectations); Level 3 (meets expectations); Level 4 (exceeds expectations); or Level 5 (substantially exceeds expectations), a 95% confidence interval for an individual teacher TVAAS estimate will often span three or even four of these levels. Thus, while an individual teacher's TVAAS estimate may cause her rating to be labeled a Level 2, a 95% confidence interval may reveal that she could in fact deserve a Level 4 or even a Level 5 rating.

71. In addition to the imprecision of individual teacher TVAAS estimates due to the relatively large standard error that accompanies those estimates, individual teacher TVAAS estimates are volatile in that they are subject to retrospective change. Individual teacher TVAAS estimates are determined using a rolling five-years-worth of standardized test result data. Each year, an individual teacher's TVAAS estimate is recalculated based on new data that drops the oldest and adds the newest of that rolling five-years-worth of data. In other words, an individual teacher's initial TVAAS estimate for 2012 would have been determined using student standardized test data from 2008, 2009, 2010, 2011, and 2012. In 2013, that teacher would receive not only a new individual TVAAS estimate for 2013 determined using the most recent five years' data (2009, 2010, 2011, 2012, and 2013), but also a recalculated individual estimate for 2012 determined with that same test data from 2009, 2010, 2011, 2012, and 2013.

72. The Tennessee Department of Education has contended that the recalculated estimates are more reliable than the original estimates.

73.     Tenn. Code Ann. § 49-1-302(d)(2)(A) requires that evaluations be a factor in employment decisions, including, but not necessarily limited to, promotion, retention, termination, compensation and the attainment of tenure status.

74.     The First to the Top Act mandate that evaluations be a factor in employment decisions, combined with the requirement that TVAAS results be a component of those evaluations, means that employment decisions will be based at least in part on statistical estimates that are imprecise and volatile.

75.     The Defendant's incorporation of individual TVAAS estimates in the determination of eligibility for and receipt of the APEX bonus deprives the Plaintiff and all other teachers in Knox County of their property interest in receipt of an APEX bonus without substantive due process because those individual estimates are so imprecise that reliance on them is arbitrary.

76.     The Defendant's incorporation of individual TVAAS estimates in the determination of eligibility for and receipt of the APEX bonus deprives the Plaintiff and all other teachers in Knox County of their property interest in receipt of an APEX bonus without substantive due process because those individual estimates are subject to recalculation after APEX bonus decisions have been made, rendering reliance on them arbitrary.

77.     The Defendant's use of an arbitrary measure of performance for determination of eligibility for and receipt of the APEX bonus deprives the Plaintiff and other teachers in Knox County of their property interest in receipt of bonuses under the APEX program without substantive due process, in violation of the Due Process Clause

of the Fourteenth Amendment to the United States Constitution and in violation of Article I, Section 8, of the Tennessee Constitution.

## COUNT FIVE

78.     The majority of teachers employed in the Knox County school district do not teach subjects or grades in which TCAP or EOC (end of course) tests used in the calculation of TVAAS estimates are administered.  For those teachers whose students do not take standardized tests used in the calculation of TVAAS estimates, TVAAS results are assigned based on school-wide or system-wide data generated from standardized test results of students in other classes or subjects with other teachers.  Those school-wide or system-wide TVAAS estimates are then used by the Defendant to determine eligibility for and receipt of the APEX bonus in the same fashion that individual teacher TVAAS estimates are used for those teachers who do teach grades or subjects in which standardized tests used in TVAAS are administered.

79.     The result of assigning school-wide or system-wide TVAAS results to that majority of teachers who teach classes or subjects where the standardized tests used in TVAAS are not administered is that those teachers' eligibility for a performance-based APEX bonus is determined in part based on the performance of students the teachers do not teach in classes or subjects the teachers do not teach.

80.     The Plaintiff is among those teachers in Knox County who, by design of the APEX program, is supposed to have her eligibility for an APEX bonus determined from system-wide data developed from standardized test scores of students the Plaintiff does not know in classes the Plaintiff does not teach.  It is only by the Defendant's mistake in relying on individual test data wrongly submitted by a guidance counselor at

the Plaintiff's school that individual data was used in determining the Plaintiff's 2011-2012 APEX bonus.

81.    Consistent with the individual fundamental liberty interests protected by the substantive component of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, a state or its political subdivision may not impose punishments or other legal burdens on individuals for actions over which the individuals had no responsibility or ability to control.

82.    The substantive component of the Due Process Clause also protects individuals from arbitrary, capricious or irrational state action.

83.    The evaluation of teacher performance and determination by the Defendant of eligibility for APEX bonuses on the basis of students and/or subjects a teacher does not teach deprives the Plaintiff and similarly situated teachers of a valuable government benefit by the imposition of an arbitrary and irrational compensation system in violation of their substantive due process rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

<u>**COUNT SIX**</u>

84.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution protects individuals from state-imposed classifications that violate the individuals' fundamental liberty interest in not being subject to legal burdens for actions over which the individuals had no responsibility or ability to control.

85.    The Equal Protection Clause also protects individuals from irrational state-imposed classifications.

86.     Relying on the teacher evaluation model developed under the First to the Top Act, the APEX bonus program determines compensation eligibility on the basis of student growth estimates regardless of whether there was data available for the students that an individual teacher actually instructed, and regardless of whether any data that was available for an individual teacher's students bore any relationship to the subject matter the instructor teachers.

87.     Teachers without student data for the subjects they teach, including the Plaintiff, are treated less favorably under the teacher evaluation model developed under the First to the Top Act and under the APEX bonus program than teachers whose students take standardized tests used for TVAAS in subjects the evaluated teacher teaches.  More specifically, the majority of the teachers in the Knox County schools have been evaluated under the Tennessee evaluation system and have had their eligibility for additional compensation under the APEX bonus system determined on the basis of the test scores of students they do not teach and/or the test scores of their students in subjects unrelated to the subjects they teach.  Meanwhile, teachers of grades and subjects in which TCAP or EOC testing is administered have been evaluated and have had their eligibility for additional compensation under the APEX bonus system determined on the basis of their own students' test scores in the subject they teach.

88.     There is no rational justification for evaluating individual teachers' performance for an academic year, and determining their eligibility for performance-based compensation for that year, on the basis of test scores of students they did not teach during the year for which the students' progress is being assessed.  Likewise, there is no rational justification for evaluating individual teachers' performance on the basis of the

test score improvement of their students in subjects that may be wholly unrelated to the classes the evaluated instructors are employed to teach.

89.     The class of teachers evaluated and compensated by the Defendant on the basis of students and/or subjects they do not teach has imposed upon them, as a condition of their employment and their receipt of performance-based compensation, an irrational evaluation system that results in arbitrary determinations of their eligibility for performance-based pay under the APEX bonus system.

90.     The foregoing shortcomings cause the APEX bonus system, on its face and as applied, to be contrary to and prohibited by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

PREMISES CONSIDERED, the Plaintiff prays:

1.     That process issue and be served upon the Defendant requiring it to answer;

2.     That, following a hearing, the Court declare the Defendant's use of the Plaintiff's individual teacher TVAAS estimate in the determination of her APEX bonus for 2011-2012 to be a breach of contract, arbitrary and capricious, and unconstitutional in violation of the Plaintiff's rights to procedural and substantive due process under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and in violation of Article I, Section 8, of the Tennessee Constitution;

3.     That, following a hearing, the Court declare the Defendant's continued use of individual teacher TVAAS estimates in the determination of APEX bonus eligibility to be arbitrary and unconstitutional in violation of the substantive due process rights of the Plaintiff and all other Knox County teachers under the Due Process Clause of the

Fourteenth Amendment to the United States Constitution and in violation of Article I, Section 8, of the Tennessee Constitution;

4.     That, following a hearing, the Court declare the performance-based pay plan set out in the APEX bonus system, on its face and as applied, to be in violation of the equal protection rights of the Plaintiff and similarly situated teachers in under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution ;

5.     That the Court order the Defendant to pay the Plaintiff the $1,500 APEX bonus she should have received for 2011-2012 based on her satisfaction of the qualifications for that bonus using the system-wide TVAAS results that she was told would be used, together with prejudgment interest;

6.     That the Court enjoin the Defendant from continuing to utilize individual teacher TVAAS results in the determination of eligibility for the APEX bonus;

7.     That the Court order the Defendant to pay the costs, including the Plaintiff's reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988; and

8.     For such further and general relief as the equities of this cause may require and the Court may deem just and proper.


/s/ Richard L. Colbert
Richard L. Colbert, #9397
W.W. Frank Wilbert, #23090
KAY, GRIFFIN, ENKEMA
& COLBERT, PLLC
222 Second Avenue North
Suite 340-M
Nashville, Tennessee 37201
(615) 742-4800

*Attorneys for Plaintiff*